[This opinion has been published in *Ohio Official Reports* at 68 Ohio St.3d 547.]

INDUSTRIAL ENERGY CONSUMERS OF OHIO POWER COMPANY ET AL.,
APPELLANTS, *v*. PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Indus. Energy Consumers of Ohio Power Co. v. Pub. Util. Comm.*,
1994-Ohio-15.]

*Public Utilities Commission—Electric utilities—Acid rain control—Commission's
determination approving an environmental compliance plan affirmed,
when.*

(No. 93-505—Submitted December 14, 1993—Decided March 30, 1994.)

APPEAL from the Public Utilities Commission of Ohio, No. 92-790-EL-ECP.

———————————

{¶ 1} This case involves an order of the Public Utilities Commission of Ohio ("commission"), appellee, approving an environmental compliance plan under R.C. Chapter 4913. For a complete understanding of the facts giving rise to this appeal, a brief introduction to the state and federal laws involved is necessary.

{¶ 2} R.C. Chapter 4913 was enacted by the General Assembly in response to Title IV of the federal Clean Air Act Amendments of 1990 ("CAAA"), Sections 7651, Title 42, U.S.Code. The purpose of the CAAA is to reduce the adverse effects of acid deposition from the atmosphere by controlling, among other things, emissions of sulfur dioxide by electric utilities. Section 7651(a) and (b).

{¶ 3} Compliance with the CAAA is to occur nationwide in two phases. In "Phase I," which begins in 1995, certain identified electric utility generating plants (Phase I affected units) must reduce annual emissions of sulfur dioxide to specified levels. Section 7651c. In "Phase II," which begins in the year 2000, most other electric utility generating units must achieve reductions in sulfur dioxide emissions. Section 7651d.

**{¶ 4}** One of the primary components of the CAAA is the establishment of a system of emission "allowances" to control the amount of sulfur dioxide emitted from affected units on an annual basis. See Section 7651b. Each emission "allowance" is a limited authorization allocated to an affected unit to emit one ton of sulfur dioxide during, or after, the calendar year in which the allowance is issued. Section 7651a(3). Under the CAAA, Phase I affected units are to be assigned annual allowances equal to the number of authorized tons of sulfur dioxide emissions. See, generally, Section 7651b(a)(1). Beginning in the year 1995, a Phase I affected unit will be required to have an emission allowance for each ton of sulfur dioxide emitted from that facility. See Section 7651c. However, the CAAA provides that emission allowances may be transferred among the designated representatives of the owners or operators of affected sources and any other person who holds such allowances. See Section 7651b(b).

**{¶ 5}** The CAAA does not specify which of a variety of possible compliance options are to be employed by an electric utility to achieve Phase I emission reductions. That matter is apparently left for the utility to decide. However, in simplest terms, a utility can meet the Phase I requirements of the CAAA at any given Phase I affected unit by reducing the amount of sulfur dioxide emitted (through, for example, a switch to lower-sulfur coal or natural gas, or by installing flue gas desulfurization equipment, *i.e.*, "scrubbers"), by acquiring additional allowances, or by some combination of these compliance strategies. It is also possible for a utility to essentially "overcomply" at one or more of its affected units (by reducing emissions below the level necessary for compliance) and save or "bank" any unused emission allowances for use at other Phase I affected units.

{¶ 6} R.C. Chapter 4913 permits an electric light company to seek commission review and approval of an environmental compliance plan[1] developed by the company to meet the requirements of the CAAA at the company's Phase I affected units. R.C. 4913.02(A). Pursuant to R.C. 4913.04(A), the commission is required to approve a plan that is adequately documented if the commission makes all the findings listed in R.C. 4913.04(A)(1) through (7), including the finding set forth in R.C. 4913.04(A)(2) that the plan constitutes "a reasonable and least-cost strategy for compliance with the applicable acid rain control requirements that is consistent with providing reliable, efficient, and economical electric service."[2] If the commission does not make all the findings listed in R.C. 4913.04(A)(1) through (7), the commission must disapprove the plan. R.C. 4913.04(B). If the commission approves the plan of an electric light company that is a public utility, the company's decision to implement a compliance measure contained in the approved plan is deemed to constitute a prudent management decision. See R.C. 4909.157(A).[3]

---

1. "Environmental compliance plan" is defined in R.C. 4913.01(B) to mean "a plan developed by an electric light company to comply with the acid rain control requirements at all generating facilities owned by the company that are affected by the Phase I acid rain control requirements."

2. "Acid rain control requirements" is defined in R.C. 4913.01(D) to mean the Phase I acid rain control requirements of the CAAA.

3. R.C 4909.157(A) provides that after the commission has approved an environmental compliance plan under R.C. Chapter 4913, the commission cannot reconsider the approval of the plan or the appropriateness or prudence of any compliance measure contained therein, except as otherwise provided in R.C. 4913.05 or 4913.06. R.C. 4913.05 mandates that the commission must review a plan which has been approved under R.C. 4913.04 between two and two and one-half years after the approval, or earlier in the event of an extraordinary change of circumstances. R.C. 4913.06 permits an electric light company to seek review and approval of a modified plan. However, nothing in R.C. 4909.157(A) limits the commission's authority under R.C. Chapters 4901, 4903, 4905 or 4909 to examine the management policies and practices of an electric light company that is a public utility in implementing a compliance measure contained in an approved plan or to examine the costs incurred by the company for implementing any such compliance measure. R.C 4909.157(B). Nor do the provisions of R.C. 4909.157(A) limit the commission's authority under R.C. Chapters 4901, 4903, 4905 or 4909 to examine the company's fuel procurement policies and practices. R.C. 4909.157(C).

{¶ 7} On April 29, 1992, Ohio Power Company ("Ohio Power"), appellee, a subsidiary of American Electric Power Company ("AEP"), submitted an application to the commission under R.C. 4913.02 seeking review and approval of a least-cost plan to comply with the Phase I requirements of the CAAA. Ohio Power's environmental compliance plan was based upon an AEP system-wide acid rain compliance report.[4] In accordance with that report, Ohio Power's plan called for installing scrubbers at Gavin Units 1 and 2, switching to lower-sulfur coal at four other Phase I affected units (Kammer Units 1-3 and Muskingum Unit 5), and continuing to burn existing coal supplies at Ohio Power's seven remaining Phase I affected units (Cardinal Unit 1, Muskingum Units 1-4, and Mitchell Units 1 and 2). Under the plan, any compliance action to be taken at Cardinal Unit 1 and Muskingum Units 1-4 was to be deferred until Phase II, at which time Cardinal Unit 1 was to be "fuel-switched" from high-sulfur coal to low-sulfur coal and Muskingum Units 1-4 were to be fuel-switched from coal to natural gas.[5]

{¶ 8} Ohio Power's plan was supported by a number of case studies offered to show that the plan was the least-cost strategy for Phase I compliance when

4. In that report, AEP developed a least-cost strategy for Phase I compliance for the AEP system. The AEP "system" includes electric utilities which service customers in parts of Ohio and other states. In formulating its least-cost compliance strategy, AEP determined the compliance options for each Phase I affected electric utility generating unit within the system and ranked those options in terms of cost effectiveness, *i.e.*, cost per ton of sulfur dioxide removed. The options were then selected in order of increasing cost per ton until compliance was achieved. Specifically, compliance strategies with a cost effectiveness of less than four hundred dollars per ton were selected for implementation to meet the Phase I requirements of the CAAA, with the exception of Ohio Power's Cardinal Unit 1. The compliance measure deemed applicable to that unit (fuel-switching from high-sulfur coal to low-sulfur coal) was deferred until Phase II. The AEP report concluded that the least-cost compliance strategy for the AEP system would include installation of scrubbers at Ohio Power's Gavin Units 1 and 2, a fuel-switch at Ohio Power's Muskingum Unit 5 from high-sulfur coal to low-sulfur coal, and a fuel-switch at Ohio Power's Kammer Units 1-3 from high-sulfur coal to moderate-sulfur coal.

5. According to the AEP report, the decision to delay compliance action at Cardinal Unit 1 was made because implementing a fuel-switch at that unit would be the highest-cost option for Ohio jurisdictional customers, when Ohio Power would already be overcomplying with the federal law on a "stand-alone" basis. Further, a fuel-switch at Cardinal Unit 1 would necessitate closure of a company-affiliated mine. Indus. Energy Consumers v. Pub. Util. Comm.

viewed in the context of the overall AEP system-wide plan. The studies evaluated two principal compliance strategies for the Gavin power plant, with each study assuming a Phase I fuel-switch at Muskingum Unit 5 and Kammer Units 1-3 as proposed in Ohio Power's plan. The case studies projected the effects on AEP's revenue requirements if Gavin was fuel-switched from high-sulfur to low-sulfur coal (Case 1) or retrofitted with scrubbers (Case 2); evaluated the effects of escalating fuel prices on these options (Case 1S and 2S); and examined compliance through the sale of allowances (Case 3). The studies revealed that, in the long run, installing scrubbers at Gavin, as opposed to a Gavin fuel-switch, was the least-cost alternative for Phase I compliance.

{¶ 9} At a hearing conducted on Ohio Power's plan, appellant Sierra Club offered evidence to show that a least-cost compliance plan would have included, as an additional compliance measure, a Phase I fuel-switch at Cardinal Unit 1. Similarly, the commission's staff suggested that a fuel-switch at Cardinal Unit 1 and Muskingum Units 1-4 at the beginning of Phase I may constitute additional cost-effective measures to be included in Ohio Power's plan. However, commission staff witness Carl R. Evans concluded that Ohio Power's plan to install scrubbers at Gavin and to fuel-switch Muskingum Unit 5 would constitute part of any least-cost compliance plan.

{¶ 10} On rebuttal, Ohio Power offered additional case studies to address the concerns of the commission's staff that an accelerated fuel-switch at Cardinal Unit 1 and Muskingum Units 1-4 could result in an even lower-cost compliance plan. Case 1E identified the effects of these additional compliance measures on the Gavin fuel-switch (Case 1) scenario. Case 2E identified the effects of a Phase I fuel-switch at Cardinal Unit 1 and Muskingum Units 1-4 on the Gavin-scrubber (Case 2) scenario. The studies revealed that a fuel-switch at Cardinal Unit 1 and Muskingum Units 1-4 at the beginning of Phase I might, in the long run, moderately reduce AEP revenue requirements under the Gavin fuel-switch and Gavin-scrubber

cases. However, the studies confirmed that installing scrubbers at Gavin was the least-cost alternative for Phase I compliance whether Cardinal Unit 1 and Muskingum Units 1-4 were fuel-switched in Phase I or Phase II.

{¶ 11} Ohio Power's witness, Henry W. Fayne, urged that the company's compliance strategy should not be changed to include a fuel-switch at Cardinal Unit 1 and Muskingum Units 1-4 in Phase I. Fayne testified that there were increased risks and uncertainties associated with an earlier fuel-switch at these facilities, and that an earlier fuel-switch would necessitate closure of company-affiliated mines, resulting in the loss of a significant number of Ohio jobs. Moreover, Fayne testified that Ohio Power would already be overcomplying with the federal law in Phase I and, therefore, additional Phase I compliance strategies were unnecessary for Ohio Power. Fayne also cautioned that according to company studies, a Phase I fuel-switch at Cardinal Unit 1 and Muskingum Units 1-4 would not necessarily be less costly for Ohio Power customers.

{¶ 12} During the pendency of the case, a stipulation was entered into in a companion electric fuel component case, which stipulation has been challenged on appeal. See *Indus. Energy Consumers of Ohio Power Co. v. Pub. Util. Comm.* (1994), 68 Ohio St.3d 559, 629 N.E.2d 423. This stipulation, among other things, set a predetermined price for calculating Ohio Power's electric fuel component rate for all coal burned at Gavin, Muskingum, Mitchell and Cardinal for a three-year period; set a "station cap" for the cost of coal burned at Gavin; and "capped" the costs for which Ohio Power could seek recovery in connection with the installation of scrubbers at Gavin. As a result of this stipulation, a further case study was generated to show the effect of the stipulation on Ohio Power's plan. That study (Case 2CS) showed that the stipulation would further reduce AEP revenue requirements in the Case 2 scenario, making the installation of scrubbers at Gavin an even more cost-effective compliance option. However, Case 2CS was merely a

variation of Case 2 and, thus, it also assumed that Cardinal Unit 1 and Muskingum Units 1-4 would be fuel-switched at the beginning of Phase II.

{¶ 13} In an order dated November 25, 1992, the commission found that Ohio Power's environmental compliance plan which incorporated the effects of the stipulation in the electric fuel component proceeding—Case 2CS—was a reasonable and least-cost strategy for compliance with the CAAA. The commission determined that the next least-cost strategy was represented in Case 2, which study also assumed that Gavin would be retrofitted with scrubbers. Additionally, the commission found that a Phase I fuel-switch at Cardinal Unit 1, if carried out, would constitute a further "least-cost measure" to be undertaken by Ohio Power. In this regard, the commission suggested that Ohio Power prepare to fuel-switch Cardinal Unit 1 in Phase I, and that Ohio Power designate Conesville Unit 4 (another AEP Phase I affected unit) and Muskingum Units 1-4 as "transfer units." The commission found that Ohio Power's plan was adequately documented, and specifically determined that all seven factors listed in R.C. 4913.04(A) had been satisfied. However, the commission's order was unclear as to whether Ohio Power's plan had been approved as filed, or whether the plan had been modified by a required Phase I fuel-switch at Cardinal.

{¶ 14} Industrial Energy Consumers of Ohio Power Company ("IEC") and the Sierra Club, appellants, applied for rehearing. In an entry denying rehearing, the commission stated that Ohio Power's plan had been approved as filed, and that the commission had only "strongly suggested" that Ohio Power take steps to have Cardinal available for fuel-switching in Phase I while designating Conesville Unit 4 and Muskingum Units 1-4 as transfer units. The commission also stated that it would expect Ohio Power in subsequent fuel cases "to demonstrate a reduced revenue requirement at least equal to the total revenue requirement benefit identified in this case resulting from a Cardinal fuel switch * * *."

{¶ 15} The cause is now before this court upon an appeal as of right.

_____

*Emens, Kegler, Brown, Hill & Ritter*, *Samuel C. Randazzo*, *Richard P. Rosenberry* and *Denise C. Clayton*, for appellant Industrial Energy Consumers of the Ohio Power Company.

*Hahn, Loeser & Parks*, *Janine L. Migden* and *Maureen R. Grady*, for intervening appellant Sierra Club.

*Lee Fisher*, Attorney General, *James B. Gainer*, *Thomas W. McNamee* and *Craig S. Myers*, Assistant Attorneys General, for appellee commission.

*Edward J. Brady*, *Kevin F. Duffy* and *Richard Cohen*, for intervening appellee Ohio Power Company.

_____

**DOUGLAS, J.**

{¶ 16} The primary issue which has been properly raised in this appeal is whether the commission approved an environmental compliance plan that was *not* least-cost, thereby constituting a violation of R.C. 4913.04. For the reasons that follow, we decline to disturb the commission's determination approving Ohio Power's plan. Accordingly, we affirm the commission's order.

I

{¶ 17} To begin our discussion, we note that this court is ordinarily called upon to review commission decisions involving ratemaking. Although the case before us obviously affects rates (as is true with virtually everything the commission does), we are confronted here with a decision of the commission which ventures into the field of policymaking concerning the best and least-cost way for a utility to comply with the CAAA. While the standard of review remains the same (to wit: the "unlawful or unreasonable" standard specified in R.C. 4903.13), we nevertheless recognize that in reviewing such determinations, we are being called upon not only to review the lawfulness of the commission's order, but also to review its wisdom in reaching its conclusions. Because such a review could tend to also

place this court in the policymaking arena, we continue our policy of not second-guessing the commission in its fundamental determinations which are not unlawful or unreasonable. We are cognizant of the fact that our decision in this case has significant implications concerning the continued viability of Ohio's high-sulfur coal mining industry, but our judgment is based strictly on the CAAA and the commission's prerogatives in approving a least-cost environmental compliance plan which satisfies the requirements of the federal law.

## II

**{¶ 18}** Ohio Power's environmental compliance plan was submitted to the commission for review and approval in the context of the overall AEP system-wide compliance plan. While we recognize that this was necessary for purposes of evaluating the Ohio Power plan, it is important to realize that only Ohio Power's plan for compliance with the CAAA is at issue in this case. The commission's order and the arguments of the parties, both for and against the commission's ultimate determination, are less than a model of clarity, but that may be driven by the fact that the information being reviewed, the federal and state laws and the reports, studies and expert testimony, is voluminous and very technical. Nevertheless, it is apparent to us what the commission sought to do in this case, and we find that the commission's order is neither unlawful nor unreasonable.

## III

**{¶ 19}** Pursuant to R.C. 4913.04(A), the commission was required to make a number of findings in approving Ohio Power's plan. The specific commission finding, around which the present controversy swirls, is that Ohio Power's plan constitutes a reasonable and least-cost strategy for compliance with the Phase I acid rain control requirements of the CAAA. R.C. 4913.04(A) provides, in pertinent part:

"[T]he public utilities commission shall issue an order approving a proposed environmental compliance plan submitted by an electric light company under

section 4913.02 of the Revised Code, and the estimated costs of and schedule for implementing the plan, only if the commission finds that the plan is adequately documented and makes all of the following findings regarding the plan:

"* * *

"(2) The plan constitutes a reasonable and least-cost strategy for compliance with the applicable * * * [Phase I acid rain control requirements of the CAAA] that is consistent with providing reliable, efficient, and economical electric service. Least-cost shall be measured over the period of both the Phase I and Phase II acid rain control requirements under * * * [the CAAA]."

{¶ 20} By far the most significant issue litigated at the commission level involved the question whether it would be more cost effective to fuel-switch or to install scrubbers at Ohio Power's Gavin plant. The Gavin power plant is the single largest emitter of sulfur dioxide in the entire AEP system and represents a significant portion of the AEP system capacity. For this reason, among others, the Phase I compliance action to be taken at Gavin was the cornerstone of the AEP system-wide acid rain compliance plan upon which Ohio Power's plan was based.

{¶ 21} In a detailed and comprehensive decision, the commission determined that Ohio Power's plan to install scrubbers at Gavin was the least-cost alternative for Phase I compliance. Under the applicable standard of review, we will not reverse the commission's decision as to questions of fact where sufficient probative evidence is contained in the record to show that the commission's decision is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. See *MCI Telecommunications Corp. v. Pub. Util. Comm.* (1988), 38 Ohio St.3d 266, 268, 527 N.E.2d 777, 780.

{¶ 22} Ohio Power's case studies showed that on an eighteen-year net present value basis, AEP's revenue requirements under the plan to install scrubbers at Gavin (Case 2) was an estimated $121 million less than the estimated revenue

requirements for the Gavin fuel-switch (Case 1) alternative. Further, if low-sulfur coal costs were to escalate more rapidly, and high-sulfur coal more slowly, than was assumed in Cases 1 and 2, the estimated revenue requirements under the Gavin-scrubber plan were shown to be $244 million less than the Gavin fuel-switch alternative (Case 1S compared to Case 2S). Moreover, when Ohio Power's plan was considered in light of the stipulation entered into in the electric fuel component proceeding (Case 2CS), installing scrubbers at Gavin was shown to be an even less costly compliance measure than had been projected in Case 2. This evidence and more contained in the record supports the commission's factual determination under R.C. 4913.04(A)(2) that Ohio Power's proposal to install scrubbers at Gavin was an integral part of a reasonable and least-cost plan for Phase I compliance.

{¶ 23} Nevertheless, appellants contend that the evidence in this case establishes that had Ohio Power's plan also included a Phase I fuel-switch at Cardinal Unit 1 and Muskingum Units 1-4, that plan would further reduce compliance costs for the AEP system. On this basis, appellants urge that the commission's finding under R.C. 4913.04(A)(2) was unlawful since the plan approved by the commission did not provide for a Phase I fuel-switch at Cardinal Unit 1 and Muskingum Units 1-4 and, thus, the plan did not constitute the least-cost compliance strategy. Our response to appellants' arguments is threefold.

{¶ 24} First, R.C. 4913.04(A)(2) requires a finding that an environmental compliance plan constitutes a *reasonable and* least-cost strategy for compliance with the Phase I acid rain control requirements of the CAAA. The evidence in this case is in conflict as to the reasonableness of requiring a fuel-switch at Cardinal Unit 1 and Muskingum Units 1-4 in Phase I. The evidence shows that such additional compliance strategies are unnecessary for Ohio Power, which will already be substantially overcomplying with the applicable federal mandates in Phase I. Further, a question remains as to whether a Phase I fuel-switch at these facilities would, in fact, be a least-cost strategy *for Ohio Power*. The commission

chose not to disturb the company's decision to delay compliance action at these facilities. As in rate cases, it is not our job to question the wisdom of the commission on matters such as this, where the commission has made a determination on a fairly debatable issue within its expertise and understanding. See, generally, *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.* (1990), 51 Ohio St.3d 150, 154, 555 N.E.2d 288, 292-293.

{¶ 25} Second, we are extremely skeptical of an interpretation of R.C. 4913.04(A)(2) that would make commission approval of an environmental compliance plan contingent upon the company's having proposed to undertake every cost-efficient compliance action possible, regardless whether such action is necessary for the company to achieve compliance with the CAAA. In our judgment, the question to be answered under R.C. 4913.04(A)(2) is whether the compliance measures chosen by the company are the least-cost measures to bring the company into Phase I compliance. For the commission or this court to interpret R.C. 4913.04(A)(2) as requiring disapproval of a plan that satisfies the minimum requirements of the federal law in a least-cost manner, on the basis that it may be more cost-efficient for the company to take additional compliance action during Phase I, would be to subject those affected by the CAAA to even more burdensome requirements than have already been exacted by virtue of the federal law. In the case at bar, the record is clear that Ohio Power will be able to achieve compliance with the applicable federal mandates by installing scrubbers at Gavin alone. As we have indicated, the commission's finding that installing scrubbers at Gavin is a reasonable and least-cost compliance strategy is a factual determination which we will not disturb, given the standard by which such a determination must be judged.

{¶ 26} Third, and finally, even if we were to assume that the commission erred in approving the plan because of the Cardinal/Muskingum fuel-switch controversy, we would nevertheless find that appellants have not been prejudiced by the commission's decision. In its order, the commission apparently considered

12

Ohio Power's proposal to delay the fuel-switch at Cardinal Unit 1 and Muskingum Units 1-4 as a "scheduling" issue involving implementation of the plan. The commission apparently sought to approve Ohio Power's plan to fuel-switch Cardinal Unit 1 and Muskingum Units 1-4, but to defer final judgment on the scheduling/timing of the fuel-switch at these facilities. In this regard, counsel for the commission has suggested that Ohio Power's plan to delay compliance action at Cardinal Unit 1 and Muskingum Units 1-4 may be considered by the commission in its two-year review of the plan under R.C. 4913.05. Counsel for the commission also suggests that since Ohio Power could achieve Phase I emission reductions by installing scrubbers at Gavin alone, the R.C. 4909.157(A) "prudence" protection associated with commission approval of an environmental compliance plan does not extend to Ohio Power's decision to delay a fuel-switch at Cardinal Unit 1 and Muskingum Units 1-4.

{¶ 27} In its brief, Ohio Power argues, among other things, that since a Phase I fuel-switch at Cardinal Unit 1 and Muskingum Units 1-4 is unnecessary for Ohio Power to meet the Phase I requirements of the CAAA, such compliance measures were arguably beyond the proper scope of the commission's inquiry in this case. Thus, Ohio Power apparently agrees that the commission's approval of the plan did not extend any protections to Ohio Power with respect to the company's proposal to delay compliance action at Cardinal Unit 1 and Muskingum Units 1-4. Ohio Power's position on this issue was further clarified at oral argument, where Ohio Power conceded that it will be willing to do whatever the commission requests at the two-year review of the plan which is shown to be prudent and least-cost with respect to the implementation of compliance measures at Cardinal Unit 1 and Muskingum Units 1-4.

{¶ 28} Under these circumstances, even if we were to conclude that Ohio Power's plan was not least-cost, we would nevertheless find that appellants have not been harmed by the commission's approval of the plan. At the R.C. 4913.05

review, appellants will be able to voice their concerns regarding the scheduling/implementation of the fuel-switch at Cardinal Unit 1 and Muskingum Units 1-4. Additionally, we note that in its entry denying rehearing, the commission "strongly suggested" that Ohio Power prepare to fuel-switch Cardinal Unit 1 in Phase I while designating Muskingum Units 1-4 as transfer units. The commission has indicated, in no uncertain terms, that it intends to enforce compliance with its order to ensure cost-effective implementation of the plan. With mechanisms peculiar to and within its control, the commission will almost certainly be able to make its "suggestions" much more than that.

IV

{¶ 29} Appellants also challenge the commission's finding that Ohio Power's plan was adequately documented. However, we find that the record does not support appellants' contentions. Although the plan may not have been documented to the degree appellants would have preferred, we have no quarrel with the commission in this regard. Appellants also contend that the commission erred in failing to address certain issues raised in their application for rehearing. However, on the basis of the record before us, we are unable to conclude that the commission's decision would have been any different had the arguments raised by appellants been addressed. Appellants also suggest that the commission's decision must be reversed if the stipulation at issue in *Indus. Energy Consumers of Ohio Power Co. v. Pub. Util. Comm.* (1994), 68 Ohio St.3d 559, 629 N.E.2d 423, is found to be unlawful. However, in that case, we upheld the validity of the stipulation.

{¶ 30} Appellant IEC further challenges the commission's decision, claiming that Ohio Power and/or the commission unlawfully modified the proposed plan. We find no support for this proposition in the record. Ohio Power's plan called for installing scrubbers at Gavin, switching to lower-sulfur coal at Muskingum Unit 5 and Kammer Units 1-3, and continuing to burn existing fuel supplies at Ohio Power's remaining Phase I affected units. The plan proposed by

Ohio Power was based upon the AEP system-wide compliance strategy which included provisions for a Phase II fuel-switch at Cardinal Unit 1 and Muskingum Units 1-4. Throughout the entire proceeding, Ohio Power's compliance strategy remained unchanged. Thus, no modification occurred. Additionally, with regard to the commission's alleged modification of the plan, the commission specifically stated in its entry denying rehearing that Ohio Power's plan had been approved as filed. Furthermore, even if the commission did modify the plan by requiring a Phase I fuel-switch at Cardinal Unit 1, that is precisely what IEC has suggested would have resulted in a least-cost plan. Thus, IEC would not have been prejudiced by the alleged modification.

{¶ 31} Finally, appellants raise a number of arguments concerning the constitutionality of Am.Sub.S.B. No. 143, 144 Ohio Laws, Part I, 817, the legislation which enacted, *inter alia*, R.C. Chapter 4913. Appellants claim that Am.Sub.S.B. No. 143, through its various provisions, creates a preference for Ohio high-sulfur coal, discriminates against out-of-state low-sulfur coal suppliers, and, thus, violates the Commerce Clause of the United States Constitution. However, we find that appellants lack standing to challenge the constitutionality of this legislation.

{¶ 32} In *Palazzi v. Estate of Gardner* (1987), 32 Ohio St.3d 169, 512 N.E.2d 971, syllabus, this court held that:

"The constitutionality of a state statute may not be brought into question by one who is not within the class against whom the operation of the statute is alleged to have been unconstitutionally applied and who has not been injured by its alleged unconstitutional provision."

{¶ 33} The class against whom Am.Sub.S.B. No. 143 is alleged to be unconstitutionally applied is out-of-state coal suppliers. Appellants are not members of that class. Moreover, appellants have failed to demonstrate, to our satisfaction, that they have been injured by the provisions of the legislation which

are alleged to be unconstitutional.  Insofar as appellants lack standing to challenge the constitutionality of Am.Sub.S.B. No. 143, it would be wholly inappropriate at this time to make any further comment on the issue.

V

**{¶ 34}** For the foregoing reasons, we affirm the commission's order approving Ohio Power's environmental compliance plan.

*Order affirmed.*

MOYER, C.J., A.W. SWEENEY, RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

FAIN, J., dissents.

MIKE FAIN, J., of the Second Appellate District, sitting for WRIGHT, J.

_____

**FAIN, J., dissenting.**

**{¶ 35}** The majority opinion is an admirably practical way of dealing with an admittedly difficult problem, but I cannot read R.C. 4913.04(A)(2) in the same way.  That provision requires that a plan for complying with the federal Clean Air Act Amendments of 1990, in order to be approved by the Public Utilities Commission, must, among other requirements, constitute "a reasonable and least-cost strategy for compliance with the applicable acid rain control requirements that is consistent with providing reliable, efficient, and economical electric service." Once a plan has been approved, a utility's implementation of the plan is declared by statute to be a prudent management decision for rate-making purposes.  R.C. 4909.157(A).

**{¶ 36}** Although Ohio Power's plan called for switching from high-sulfur coal at several locations when Phase I of the federal Act begins in 1995, and also for using scrubbers at the Gavin locations at that time, the plan for several other locations called for no changes until Phase II, in 2000.  Ohio Power has never sought to modify its plan.

**{¶ 37}** There may have been conflicting evidence as to whether the alternative strategy of switching to low-sulfur coal or natural gas at the other locations (Cardinal Unit I and Muskingum Units 1-4) in 1995 would cost less than waiting until 2000 to do so, but the fact is that the commission found that the earlier fuel switch at those locations would cost less, and there is evidence in the record to support that finding.

**{¶ 38}** In view of the commission's finding that a strategy of switching to low-sulfur fuels at the other locations in 1995, rather than waiting until 2000 to do so, would cost significantly less, I cannot conclude that the plan actually submitted by Ohio Power is a "reasonable and least-cost strategy" for compliance with applicable acid rain control requirements. It may lie within the universe of all "reasonable" strategies for compliance, but it is not "least-cost," and the requirement is in the conjunctive.

**{¶ 39}** I would reverse the commission's approval of the plan submitted by Ohio Power, and remand this matter to the commission, which could, and should, encourage Ohio Power to modify its plan to provide for earlier fuel switches at Cardinal Unit I and Muskingum Units 1-4.

_____