ARMCO, INC., APPELLANT, *v.*
PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.
PRIVATELY OWNED TELEPHONE SUPPLIERS
ASSOCIATION, INC., APPELLANT, *v.*
PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.

[Cite as Armco, Inc., v. Pub. Util. Comm. (1982),
69 Ohio St. 2d 401.]

(Nos. 81-510 and 81-511—Decided February 24, 1982.)

404

*Messrs. Steer, Strauss, White & Tobias, Mr. James J. Ryan* and *Mr. F. Bruce Abel,* for appellant Armco, Inc.

*Messrs. Bricker & Eckler, Ms. Sally W. Bloomfield* and *Mr. David V. Stivison,* for appellant Privately Owned Telephone Suppliers Association, Inc.

*Mr. William J. Brown,* attorney general, *Mr. Marvin I. Resnik* and *Mr. David M. Neubauer,* for appellee.

*Mr. Donald W. Morrison, Mr. Ronald L. Orloff* and *Mr. Charles S. Rawlings,* for intervening appellee.

*Per Curiam.* "The scope of this court's review of commission orders is set forth in R. C. 4903.13, which states in pertinent part:

" 'A final order made by the public utilities commission shall be reversed, vacated, or modified by the supreme court on appeal, if, upon consideration of the record, such court is of the opinion that such order was unlawful or unreasonable.'

" 'Under the "unlawful or unreasonable" standard specified in R. C. 4903.13, this court will not reverse or modify an opinion and order of the Public Utilities Commission where the record contains sufficient probative evidence to show that the commission's determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the

record as to show misapprehension, mistake or willful disregard of duty,' *Columbus* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 103, 104. See, also, *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108, 110; *Ohio Utilities Co.* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 153, 164; *Duff* v. *Pub. Util. Comm.* (1978), 56 Ohio St. 2d 367, 370; *General Motors Corp.* v. *Pub. Util. Comm.* (1976), 47 Ohio St. 2d 58, paragraph two of the syllabus; *Cleveland Electric Illuminating Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403, paragraph eight of the syllabus. We assess the appellants' objections with this standard of review in mind." *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 153, 155-156.

## I.

Appellants challenge the commission's procedural handling of the instant case in several respects. First, they contend that the commission in approving OBT's flexible rate schedule improperly invoked its authority under R. C. 4905.381 to determine and prescribe rules, regulations and practices of a telephone company upon complaint brought pursuant to R. C. 4909.26, thereby bypassing the procedural requirements applicable to rate changes imposed by R. C. 4909.17 through 4909.19. In its opinion and order the commission asserted that "it * * * ha[d] proper jurisdiction in this matter under Sections 4905.26 and 4905.381, Revised Code * * * ." The commission went on to state, however, that " * * * by incorporating the record of the flexible pricing self complaint case into the record of general rate case (and even permitting the introduction of additional evidence concerning flexible pricing into the record during the rate case public hearings), the Commission believes that it has silenced all arguments as to whether it has the jurisdiction to grant Ohio Bell's request for relief." The entire record of the complaint case was properly before the commission as part of the ratemaking proceeding brought pursuant to R. C. 4909.17 through 4909.19.

We find it unnecessary to decide whether the commission misapplied R. C. 4905.381 and 4909.26 because the commission clearly had the authority under its general ratemaking power to consider the issues raised in OBT's complaint in the context of the general rate case. Thus, even if, *arguendo,* R. C.

4905.381 and 4909.26 are inapplicable to the issues raised in the instant appeal, the commission has an independent statutory basis, namely the rate case brought pursuant to R. C. 4909.17 through 4909.19 and related statutes, upon which to entertain the questions posed by OBT's application for an increase in rates. Under these circumstances, any opinion this court might express regarding the correctness *vel non* of the commission's reliance on R. C. 4905.381 and 4909.26 would be purely advisory, and it is well-settled that this court does not indulge itself in advisory opinions.

Appellants further argue that the flexible rate schedule approved by the commission is procedurably flawed in that the commission has permitted OBT to bypass the statutorily mandated procedures respecting rate changes that are contained in R. C. 4909.17 through 4909.19. It is appellant POTS' position that flexible pricing constitutes an unlawful delegation of the commission's regulatory authority to OBT in violation of R. C. 4909.17 through 4909.19 " * * * because, once tariffs which increase rates and charges are filed with the commission, they become effective without an order of the public utilities commission pursuant to R. C. 4909.18 and 4909.19. R. C. 4909.17, 4909.18 and 4909.19 do *not* provide a basis of authority for the 'flexible' pricing tariff; they specifically *prohibit an exemption* from following the rate increase application procedure."[4] (Emphasis *sic*.)

Appellant Armco adopts essentially the same line of argument, asserting that " * * * [u]nless there is elsewhere in the Code some applicable exception, the rates of any utility may be changed only (a) upon written application under R. C. 4909.18, (b) after a hearing under R. C. 4909.19 unless the change is not an increase, and (c) upon an Order of the Commission under R. C. 4909.18 and R. C. 4909.15(D) fixing and establishing the changed rates as just and reasonable rates." Failure to adhere to these statutorily mandated procedures amounts to, in Armco's words, "unlawful administration deregulation." Moreover, according to Armco, the commis-

---

[4] POTS also argues that R. C. 4909.16 (emergency ratemaking power) provides a statutory mechanism by which the commission may compensate for regulatory lag. POTS is quick to note, however, that relief pursuant to R. C. 4909.16 does not lie in the instant case, a conclusion neither the commission nor OBT contests.

sion's alleged circumvention of the statutory rate changing provisions renders the flexible rates approved by the commission constitutionally infirm because "[t]he customers of a Public Utility are entitled as a matter of due process of law to a hearing and the production of evidence when an increase in their utility rates is proposed."

For its part the commission contends that " * * * changes within the minimum-maximum range which has been approved by the Commission are not changes in a rate. The range itself is the rate and OBT may exercise the flexibility of that rate." Consequently, " * * * [s]ince changes within the tariff's range are not rate changes as contemplated by R. C. 4909.15, .16, .17, .18 and .19, those statutes and the arguments regarding their requirements for rate changes are inapplicable to these appeals." The commission adopts the view expressed by the Michigan Public Service Commission in *Re Michigan Bell Tel. Co.* (October 28, 1980), No. U-6231, at page 55, that " * * * [c]ommission approval of the proposed range is legally and factually equivalent to approval of each charge within the approved range. Therefore, putting into effect charges within the approved range, charges already approved by the Commission after notice and hearing, would not require individual applications, notices and hearings."

The commission further contends that Armco's deregulation argument and POTS' delegation of authority argument, based on the alleged violations of R. C. 4909.17 through 4909.19, "simply beg the question and are irrelevant." We acknowledge that there is an element of question begging in these arguments in that if the commission is in fact empowered to establish flexible rates, then, by necessary implication, it has neither deregulated nor delegated its authority in contravention of R. C. 4909.17 through 4909.19, by enacting the flexible rate schedule controverted herein. If, however, the commission is not so empowered, then appellants' contentions regarding the legislatively mandated procedural scheme become highly relevant. In any event, disposition of these procedural questions must necessarily turn on our disposition of the substantive question presented in this appeal. Accordingly, we now consider the question whether the commission is statutorily authorized to implement the flexible rate schedule proposed by OBT.

## II.

The commission relies on R. C. 4905.31(E) as statutory authority under which it may establish flexible pricing "[e]ven if there was some [other] provision [*e.g.* R. C. 4909.15] to be found which prohibited flexible rates * * * ." R. C. 4905.31 provides in relevant part:

"Except as provided in section 4933.29 of the Revised Code, Chapters 4901, 4903, 4905, 4907, 4909, 4921, and 4923, of the Revised Code do not prohibit a public utility from filing a schedule or entering into any reasonable arrangement with another public utility or with its customers, consumers, or employees providing for:

"* * *

"(E) Any other financial device that may be practicable or advantageous to the parties interested. * * * "

Flexible pricing is for purposes of the statute "a financial device." Although appellants strenuously contend that the approved flexible tariffs are neither practicable nor advantageous to the parties interested, we are of the opinion that the commission's resort to flexible pricing for the enumerated competitive vertical services and equipment is, in the broadest sense, practicable and advantageous. For OBT's vertical services customers the flexible pricing schedules provide a more meaningful range of competitive telecommunications options. For OBT's basic ratepayers the flexible pricing schedules offer the possibility of reduced rates if optimization does occur and the moneys generated thereby flow back to the general ratepayers pursuant to the OBT-OCC stipulation.

We would be remiss, however, if we failed to point out that R. C. 4905.31(E) constitutes an exception to the general ratemaking formula contained in R. C. 4909.15. The major premise underlying the commission's approval of flexible pricing is that "[t]here is in existence increasing and effective competition from unregulated suppliers in the marketplace" and that "given the FCC's decision [in *Re Second Computer Inquiry* (1980), 35 PUR 4th 143, 77 F.C.C. 2d 384] to deregulate, it [competition] can only accelerate." If subsequent events, most notably the recently announced settlement in the AT&T antitrust case, undermine the commission's major premise by restricting OBT's participation in competitive

markets, then the commission may well wish to review its position on flexible pricing.

Having determined that the commission is empowered to implement flexible pricing pursuant to R. C. 4905.31(E), which specifically overrides R. C. Chapters 4901, 4903, 4905, 4909, 4921, and 4923, we find it unnecessary to address appellants' various statutory arguments premised on the aforestated chapters. With respect to Armco's constitutional argument the general rule, from which we do not deviate, is that ratepayers are statutorily but not constitutionally afforded the right to participate in ratemaking proceedings. *Cleveland* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 446, at page 453. Accordingly, Armco's Fourteenth Amendment claim is without merit.

This court is aware of the imminent preemptive federal deregulation of significant portions of the telecommunications industry[5] and the potential impact of the AT&T settlement. The commission traced the history and development of competition in its order:

"The Commission finds the state of the telecommunications market has changed dramatically over the past decade. In 1968, the FCC ruled that the use of interconnecting devices furnished by other suppliers of telephone equipment rather than the telephone company providing basic service was not to be prohibited. In *Re Use of Carerfone in Message Toll Telephone Service,* 77 PUR 3rd 417 (1968). This significant decision opened the door to competition in the telecommunications market, which had previously been primarily a monopoly market. During the 1970's numerous companies entered the field of supplying telecommunications equipment.

"More recently, the FCC issued a decision likely to have

---

[5] In *Dayton Communications Corp., infra,* we took cognizance of this development, stating, at page 306, that "[i]n recent years certain areas of the telecommunications industry have been, to varying degrees, 'deregulated'. Since 1968, for example, consumers have had available to them the option of purchasing their own telephone equipment for connection to the local and long-distance network, in lieu of using utility-owned equipment. [See *In re Carterfone* (1968), 13 FCC 2d 420.]

"As a result telephone companies such as Ohio Bell have found themselves to be operating in two markets, one monopolistic and one competitive, and the line between telephone company activities which are properly subject to public regulation and those which are not has become blurred."

an even greater impact on competition than the *Carterfone* decision. On May 5, [*sic* May 2] 1980, the FCC issued its opinion in its *Second Computer Inquiry* (Docket No. 20828), ordering that all terminal equipment should be de-tariffed no later than March 1, 1982. The FCC recognized '[t]hat as a practical matter, the states may no longer be able to regulate, as they have in the past, the charges for terminal equipment used jointly in the provision of intrastate and interstate services.['] *FCC Second Computer Inquiry Final Decision* (Docket No. 20828), May 5, [*sic*] 1980, at p. 78-79. [35 PUR 4th, at 212, 77 F.C.C. 2d, at 455.] While there is some question at this date whether the FCC will deregulate terminal equipment by March 1, 1982, this Commission recognizes that deregulation will occur at some point. If competition has proliferated in the 1970's, given the FCC's decision to deregulate, it can only accelerate."

We are further aware that deregulation and the AT&T proposed divestiture pose significant new problems for the commission. While the FCC anticipated that its *Second Computer* ruling would create difficulties for state regulatory authorities,[6] the AT&T settlement may ultimately prove more

---

[6] The FCC position is exemplified by the following passage which appears in *Re Second Computer Inquiry, supra* (39 PUR 4th), at page 373:

"We are aware that requiring carriers to unbundle and detariff CPE [Customer Premises Equipment] used jointly in the provision of interstate and intrastate service has the practical effect of eviscerating state jurisdiction to establish charges for this terminal equipment in a manner that conflicts with federal interests. But, we preempt the states here only to the extent that their terminal equipment regulation is at odds with the regulatory scheme set forth. We do not assess here the legality under the Communications Act of future attempts by the states to regulate CPE in ways which they perceive to be consistent with this decision. We shall address such regulatory attempts, should they present themselves, on an ad hoc basis."

As one commentator has noted in evaluating the FCC's *Re Second Computer Inquiry* handiwork:

" * * * A foreseeable problem lies in the reluctance of state regulatory agencies to follow the FCC's lead by adjusting intrastate telecommunications charges and contributions to joint and common costs. An intrastate communications service charge that still reflects a substantial contribution to costs incurred in the provision of CPE burdens customers who do not use telephone company equipment, but who are forced to subsidize its development and use. It also puts non-carrier equipment vendors at a disadvantage since they will not benefit from excessive ratepayer contributions to underlying carrier equipment costs, part of which might be used to develop competitive CPE rather than reduce line costs.

vexatious for state regulators than *Second Computer*. What is clear is that the radical transformation of the formerly monopolistic, regulated telecommunications market is proceeding apace and that this transformation is of such magnitude as to require a thorough reexamination of these regulatory practices and procedures which have become inapplicable or obsolescent in the face of non-monopolistic market conditions.

## III.

Appellant POTS vigorously contends that the commission "erred in refusing to consider the anti-competitive intent and effect of the Proposed Ohio Bell Telephone Company tariffs." POTS argues, in sum, "that R. C. 4905.22, 4905.33, and 4905.35 require the commission to only allow 'just and reasonable' rates and charges. Practices designed to drive competitors out of business and to restore a dominant firm to its former monopoly position are clearly *not* just and reasonable. Likewise, R. C. §4909.15 through 4909.19 lead to the same conclusion: Tariffs which embody anti-competitive schemes are unjust and unreasonable; the commission must consider such allegations in its deliberations and the commission must do what it can to assure that the anti-competitive impact of proposed tariffs is eliminated. In the instant case, that would have meant restricting Ohio Bell to shorter contract periods for its terminal equipment (probably on the order of one year) and refusing to allow disproportionate and unjustified increases in the rates for older, electro-mechanical PBX's." (Emphasis *sic*.)

POTS places particular emphasis on the "Migration

---

"The removal of the most common CPE device, the telephone, from the rate base of the local telephone company raises concern that local exchange rates might have to rise significantly to compensate for revenue shortfalls." Frieden, The Computer Inquiries: Mapping the Communications/Data Processing Terrain (1981), 33 Fed. Comm. L.J. 55, 94-95.

Cf. *Re Southwestern Bell Telephone Co.* (Kan. 1981), 42 PUR 4th 89, at page 139: "Implementation of the Second Computer Inquiry has broad implications and raises complex issues and problems that will probably take a substantial length of time for state regulatory agencies to sift through and resolve."

See, generally, Johnson, The Dilemma in Mixing Competition With Regulation, 103 Pub. Util. Fort. 15 (February 15, 1979); Notes, Competition in the Telephone Equipment Industry: Beyond *Telerent,* 86 Yale L.J. 538 (1977).

Strategy" formulated by AT&T at the national level and distributed to OBT and other Bell System operating affiliates. POTS characterizes the "Migration Strategy" as a "national anti-competitive plan * * * to force business customers to 'migrate' from older equipment to OBT's newest offerings, * * * under long-term contracts, to freeze out competition in this market for years to come."

The commission declined to pass judgment on the Bell "Migration Strategy," stating that it did "not intend to act as a referee in skirmishes between private telephone equipment suppliers and telephone companies," a position previously taken by the commission in *Solsound Industries* v. *Ohio Bell Tel. Co.* (December 21, 1978), No. 76-26-TP-CSS. The commission viewed its duty to inquire into OBT's alleged anti-competitive pricing in limited terms: " * * * [i]nsofar as the pricing of a competitive product or service is a matter of concern, the Commission sees its duty as being to insure that a public utility does not provide a competitive product or service at less than actual cost." This standard corresponds to that set forth in R. C. 4905.33, which is the only statute at issue that speaks directly to competition. R. C. 4905.33 states in relevant part:

" * * * No public utility shall furnish free service or service for less than actual cost for the purpose of destroying competition."

POTS does not contend that OBT's prices as approved by the commission provide for either "free service or service for less than actual cost." Rather, POTS complains that pursuant to the "Migration Strategy" certain of OBT's tariffs on older lines of equipment are set too high relative to the actual costs therefor so as to encourage OBT's customers to "migrate" toward more recently introduced models, which OBT markets on long-term contracts. The allegedly anti-competitive practices complained of herein do not fall within the purview of R. C. 4905.33. Moreover, as the commission stated in *Solsound, supra,* " * * * [i]t is not the function of this Commission to administer anti-trust laws, but rather to fulfill its statutory duty, to protect utility customers from unjustly discriminatory rates. * * * " In short, the commission is without jurisdiction to entertain allegations of anti-competitive

practices unless the statutory conditions precedent, "free service or service for less than actual cost," obtain. Therefore, the commission, consistent with R. C. 4909.33 and our decision in *Dayton Communications Corp.* v. *Pub. Util. Comm.* (1980), 64 Ohio St. 2d 302, did not err in limiting the scope of its review of POTS' anti-competition claims.

For the reasons hereinbefore stated the order of the commission is affirmed.

*Order affirmed.*

SWEENEY, HOLMES, C. BROWN and KRUPANSKY, JJ., concur.

CELEBREZZE, C. J., W. BROWN and LOCHER, JJ., dissent.

LOCHER, J., dissenting. I cannot concur in the judgment that the commission is empowered to approve OBT's flexible rate proposal. Rather, I agree with appellants that the approval of the flexible rate amounts to a deregulation of OBT and believe the majority has abandoned the well-established precedent that " * * * the commission is a creature of the General Assembly and can exercise no authority beyond that granted to it by statute." *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 153, 166; *Dayton Communications Corp.* v. *Pub. Util. Comm.* (1980), 64 Ohio St. 2d 302, 307.

R. C. Title 49 invests the commission with authority to regulate public utilities and in furtherance of that goal R. C. 4909.15 establishes a rate-making formula which the commission is required to apply in setting " * * * *the* just and reasonable rate * * * that will provide the public utility *the* allowable gross annual revenues under division (B) of this section * * * ." (Emphasis added.) The manner of computing the "just and reasonable rate" and "allowable gross annual revenues" is fixed by statute and this court has repeatedly held that the commission must fix rates in accordance with the standards set by the General Assembly. See, *e.g., Consumers' Counsel* v. *Pub. Util. Comm., supra; Pike Natural Gas Co.* v. *Pub. Util. Comm.* (1981), 68 Ohio St. 2d 181; *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 372.

In the case at bar, only the minimum rates were fixed in

accordance with the standards enunciated in R. C. 4909.15. The upper range of rates is not based upon considerations contained in R. C. 4909.15, but arbitrarily allows an increase in rates of up to two times the rate authorized by statute. The commission and majority concede that the upper range of rates exceeds "the just and reasonable rate" by recognizing that they authorize revenues in excess of "the allowable gross annual revenues." The decision to impose the excessive rates in the upper range is within the sole discretion of OBT.

I disagree with the majority's conclusion that R. C. 4905.31(E) authorizes the commission to abrogate the comprehensive rate-making formula in R. C. 4909.15. R. C. 4905.31(E) contemplates an arrangement which the parties interested have agreed is beneficial to them. In the case at bar, the interested parties are OBT and its customers subject to the flexible rates such as appellant Armco. The agreement exists between OBT and these customers. At the time of this arrangement, the residential consumers represented by OCC were not "interested parties"; and whether the "optimization" scheme will ever materialize into a reduction of residential rates sufficient to render them "interested," remains in question.

Moreover, I can find no compelling circumstances to justify overriding the entire rate-making scheme by such a broad interpretation of R. C. 4905.31(E). OBT is before the commission annually for a rate increase and has made no showing that those increases are insufficient to preserve its financial integrity. I recognize that the continued efficacy of regulating OBT's vertical services and equipment is questionable in light of increased competition in the telecommunications industry and that deregulation is imminent. However, I also recognize that such a drastic change in the regulatory scheme must come from the General Assembly or by way of federal pre-emption, and that the decision to deregulate is not within the discretion of the commission.

CELEBREZZE, C. J., concurs in the foregoing dissenting opinion.