The City of North Canton, Appellant, *v.* Hutchinson, Appellee.

[Cite as *N. Canton v. Hutchinson* (1996), 75 Ohio St.3d 112.]

(No. 94–1893—Submitted December 6, 1995—Decided March 4, 1996.)

113

*Thomas M. Bernabei,* Canton City Law Director, *Francis G. Forchione,* Canton City Prosecutor, and *Jay J. Pordan,* Assistant City Prosecutor, for appellant.

*Todd A. Bergert,* for appellee.

*Rittgers & Mengle* and *W. Andrew Hasselbach,* urging affirmance for *amicus curiae,* Ohio Association of Criminal Defense Lawyers.

DOUGLAS, J.  The only issue before this court concerns the "Order of Release" issued by the shift supervisor for the Stark County Jail, releasing appellee and delaying the commencement of her jail term until July 3, 1998.[1]  Specifically, appellant appeals to this court, contending that the directive issued by the shift supervisor was not an appealable "order" and, therefore, the court of appeals was without jurisdiction to review whether the delay was proper.

Appellee, on the other hand, argues that the issue regarding the suspension of sentence was properly before the court of appeals because the release issued by the shift supervisor stated that she (appellee) was "released * * * due to a special journal entry governing jail overcrowding," and because her release was noted on the trial court docket sheet.  In this regard, appellee asserts that the trial court had specifically "authorized the jail to release certain defendants and order them to report back at a future date."  Additionally, appellee asserts that the release was a final and appealable order because "there is no question that the order affected a 'substantial right' as that term is used in Ohio Revised Code section 2505.02 * * *."

It is important to first note that this court is deeply concerned with the issue of jail overcrowding with the results, flowing therefrom in some parts of the state, of court-ordered sentences of incarceration not being carried out.  Some of the reasons for this crisis, as well as facts and figures in relation to the problem, are fully documented in the well-researched and –written column of Glenn Gilbert,

---

1.  Appellee has not filed a cross-appeal with regard to the affirmance by the court of appeals of her conviction and sentence.

Managing Editor of The News–Herald, Willoughby, Ohio, in an article appearing in The News–Herald of December 9, 1995.[2] We are not unaware of such comment.

We are further mindful that it might be of help to the bench and bar of this state for us to weigh in on the "cruel and unusual" punishment question presented to us. It would also be appropriate, if we had jurisdiction, to comment on (1) the possible use of mandamus to bring about a final order that would be appealable; (2) the applicability or nonapplicability of R.C. 2953.21, post-conviction relief; (3) the disconcerting and seemingly unlimited power given to some jailers to pick and choose which sentences of incarceration should be carried out immediately and those that are to be deferred; and (4) the necessity of legislative and executive authority to provide the wherewithal for the third branch of government, the Judiciary, to carry out our sworn responsibilities.

It is tempting to us to consider, discuss and rule on some or all of the foregoing issues and even some others not set forth. In addition, we recognize that the main issue presented is one that is capable of repetition. However, none of this matters because the issue being appealed to us does not emanate from an order which is final and appealable, as explained *infra*. Accordingly, any opinion we would render on an issue which is not the subject of a final judgment would be, at best, advisory in nature. It is, of course, well settled that this court will not indulge in advisory opinions. See *Egan v. Natl. Distillers & Chem. Corp.* (1986), 25 Ohio St.3d 176, 25 OBR 243, 495 N.E.2d 904, syllabus; *Armco, Inc. v. Pub. Util. Comm.* (1982), 69 Ohio St.2d 401, 406, 23 O.O.3d 361, 365, 433 N.E.2d 923, 926; and *Cascioli v. Cent. Mut. Ins. Co.* (1983), 4 Ohio St.3d 179, 183, 4 OBR 457, 460, 448 N.E.2d 126, 129. Thus, for the reasons which follow we *must* respectfully decline to answer the issue presented.

The contentions set forth by appellee do not support a finding that the directive issued by the jail supervisor was an appealable order. R.C. 2505.03(A) states that "[e]very final *order, judgment,* or *decree of a court* and, *when provided by law,* the final order of *any administrative* officer, agency, board, department, tribunal, commission, or other instrumentality may be reviewed on appeal by a court of common pleas, a court of appeals, or the supreme court, whichever has jurisdiction." (Emphasis added.) Further, R.C. 2505.02 sets forth three types of final orders: " '(1) an order affecting a substantial right in an action which in effect determines the action and prevents a judgment; (2) an order affecting a substantial right made in a special proceeding or made upon summary application after judgment; or (3) an order vacating or setting aside a judgment or granting a new trial.' " *Groveport–Madison Local Edn. Assn., OEA/NEA v. State Emp.*

---

2. See Appendix, *infra.*

*Relations Bd.* (1992), 62 Ohio St.3d 501, 505–506, 584 N.E.2d 700, 703, citing *Chef Italiano Corp. v. Kent State Univ.* (1989), 44 Ohio St.3d 86, 87–88, 541 N.E.2d 64, 67.

The directive issued by the shift supervisor was not an "order" as that term is used in R.C. 2505.03(A) or 2505.02. It was not an order issued by a court, nor did it emanate from an administrative entity. R.C. 2505.03(A). In fact, regardless of the language used in the release, there is nothing in the record indicating that the trial court was ever aware that commencement of appellee's jail term had been suspended. Appellee's release from jail and suspension of sentence were granted *solely* by the jail shift supervisor and not the trial court. Moreover, although appellee's release was noted on the docket sheet, the release and conditions therein were not reviewed and approved by the trial court and the release was not part of a court order or entry.

Thus, we hold that absent explicit review and judgment by a trial court, a directive issued by a jail authority releasing a defendant and suspending the commencement of his or her sentence because the jail is at maximum capacity and cannot accommodate the defendant is not an "order" that may be appealed.

Since the order issued by the supervisor of the jail was not an appealable order, we are, as was the court of appeals, without jurisdiction to consider whether the delay in commencement of appellee's sentence was proper. The appropriate time for us and/or the court of appeals to consider this issue is when it has properly been appealed from a final order.

Accordingly, since neither the court of appeals nor we had or have jurisdiction to consider the issue, we vacate that portion of the judgment of the court of appeals which dealt with the commencement of sentence issue and, further, we dismiss this appeal. We remand the case to the trial court, which may, on remand, enforce its order or enter an amended order to reflect deferral of the incarceration of appellee or take whatever other action the trial court deems appropriate.

*Appeal dismissed.*

RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

WRIGHT and PFEIFER, JJ., concur separately.

MOYER, C.J., WRIGHT and COOK, JJ., concur in the syllabus and judgment.

PFEIFER, J., concurring. I concur with the majority opinion and syllabus, but regret that the procedural posture of this case keeps us from addressing the problem it illustrates. The lack of jail space requires sentencing judges to concern themselves not only with justice, but also with practicalities. Trial judges cannot sentence defendants to facilities which cannot accommodate them

and leave to the jailer the decision of prioritizing who actually serves sentences and when they serve them. The sentence is the responsibility of trial judges, who have no choice but to recognize the problem of jail overcrowding, monitor it, and find sentencing alternatives to relieve it.

WRIGHT, J., concurs in the foregoing concurring opinion.

APPENDIX

# Prisons full, and it sure is expensive

When Americans said they were fed up with crime, politicians took them seriously.

They passed laws mandating tougher sentences, necessitating a frenzy of prison building A report this week shows U.S. prison population at an all-time high.

In Ohio, the Supreme Court is dealing with a case that indicates many Ohio jails are operating at their capacity.

Certainly it is legitimate to wonder where this will all end. One thing is certain: so far it has entailed a hugh increase in taxpayer expense. And according to Reginald Wilkinson, director of the Ohio Department of Rehabilitation and Correction, there is no respite on the horizon.

Glenn Gilbert

For the record, there has been a 298 percent increase in state spending on corrections in the past 10 years, according to the Columbus-based Ohio Public Expenditure Council. In 1985, corrections constituted 2.9 percent of the state's budget; this year, that figure is up to 6 percent.

As for the number of inmates in state prisons, the figures are, well, staggering. On July 1, 1985, there were 19,861 inmates. On July 1 of this year, there were 43,158.

Nationally, prison population has just shown its largest one-year increase ever, making the United States first in the world when it comes to locking up its citizens, according to the Department of Justice.

The United States now has an incarceration rate of 565 per 100,000 people, edging out the latest figure for Russia, according to the Sentencing Project, a nonprofit research group.

Nationwide, the number of state prison inmates increased by 9 percent. Ohio's one-year increase was less than that — 4.9 percent — but still "somewhat dramatic," according to Wilkinson.

Concerning jails, Ohio Supreme Court justices were asked this week if it is fair to force people to wait five years to serve 12 days behind bars. Nancy Hutchinson of Stark County was convicted in June 1993 of resisting arrest, criminal trespassing and disorderly conduct. When she showed up to serve her time, she was told to return in July 1998.

You can guess the rest of the story: she sued.

Hutchinson is not alone. At least 14,080 people statewide have been told to come back later to serve time in local jails because there was no room for them. Fortunately, this is NOT a problem in Lake, Geauga and Cuyahoga counties, apparently proving that we take care of our own.

At any rate, all of this illustrates that as a society we have gotten tough with criminals In Ohio, the facts have many ramifications, among which are:

■ If you have more prisoners, you have greater potential for problems. Ohio has experienced 18 prison escapes this year, compared to eight last year.

Fourteen prisons have been built in Ohio in the past 10 years, most of them campus-style and with multiple buildings, according to Wilkinson. They reflected the corrections philosophy at the time and were also popular because they were cheaper to build, he says.

"The idea was to have the least restrictive type of environment, but the type of prisoner we're sending to prison today is different," Wilkinson says.

No kidding. Just think back to the April 1993 riot at the Lucasville prison that resulted in the deaths of guard Robert Vallandingham and nine inmates. The state's response was to plan to segregate the worst prisoners and target them for the $65 million "supermax" penitentiary under construction in Youngstown.

■ Perhaps there are alternatives to prison sentences for non-violent offenders. Wilkinson points out that for the first time, this has been recognized in a state law, Senate Bill 2, passed earlier this year. This is not to say that all non-violent offenders should be removed from prison. "Many of them need to be there," said Wilkinson.

■ There should be greater efforts to keep people from committing crimes in the first place. To this end, the Ohio Office of Criminal Justice Services (OCJS) has established the Ohio Violence Prevention Center.

According to OVPC Director Sharon Reichard, the center's objectives are to reduce gun violence and promote peaceful relations. OVPC will be dispensing $150,000 to local programs with this aim. According to OVPC, police departments in Fairport Harbor, Madison Township and Willoughby Hills have such programs, as well as the Lake County Sheriff's Office and Lakeland Community College Campus Police. Other worthy local agencies working to prevent crime are Lake County's Forbes House and the Lake-Geauga Center on Alcoholism and Drug Abuse.

■ It would be helpful if a non-political approach were taken to solving the crime problem. Here is the best news of all. This has pretty much occurred in Ohio. Administrative and legislative branches are on the same page concerning what needs to be done to combat crime.

Michael Lee, director of OCJS, which administers millions of dollars in federal grant money, points out that political leaders deliberately chose this non-election year for serious work on crime legislation. The result was a "balanced, proactive, reactive" remedy, Senate Bill 2, which almost everyone supported

State Attorney General Betty Montgomery recently spoke to some second and third graders at an East Cleveland elementary school.

"These kids told me about the horrors they experience daily," Montgomery reports. "And they're crying out for help ... You and I can give these kids hope by committing ourselves to stopping the people who terrorize."

*Glenn Gilbert is managing editor of The News Herald*

NEWS HERALD
WILLOUGHBY, OH
FRI & SUN CIRC 61,343

DEC-9-95