[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 229.]

TIME WARNER AxS, APPELLANT, *v*. PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.

AT&T COMMUNICATIONS OF OHIO, INC., APPELLANT, *v*. PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.

MCI TELECOMMUNICATIONS CORPORATION, APPELLANT, *v*. PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.

[Cite as *Time Warner AxS v. Pub. Util. Comm.*, 1996-Ohio-224.]

*Public Utilities Commission—Telecommunications—Alternative regulation— Commission exceeded scope of its statutory authority when it used alternative rate-setting methods to establish telecommunications company's basic local exchange service rates—Increasing single tariff does not trigger application of R.C. 4927.04(A) when net tariff charges for the basic local exchange service as a whole result in a revenue decrease.*

(Nos. 95-587, 95-588 and 95-589—Submitted December 13, 1995,—Decided March 5, 1996.)

APPEALS from the consolidated order of the Public Utilities Commission of Ohio, Nos. 93-487-TP-ALT and 93-576-TP-CSS.

———————————

{¶ 1} These appeals involve the consolidated order by the Public Utilities Commission of Ohio ("commission") adopting a stipulation resolving an Ameritech Ohio ("Ameritech")[1] application for an alternative form of regulation under R.C. 4927.04(A), case No. 93-487-TP-ALT, and a complaint filed against

---

1. Ameritech Ohio was formerly known as the Ohio Bell Telephone Company.

Ameritech by the Office of Consumers' Counsel ("OCC"), pursuant to R.C. 4905.26, case No. 93-576-TP-CSS.

{¶ 2} Ameritech is an Ohio corporation engaged in the business of providing telecommunications service within Ohio, and is subject to the commission's control and jurisdiction. Ameritech's service territory comprises approximately twenty-five percent of the state of Ohio, including the metropolitan areas of Akron, Columbus, Cleveland, Dayton, Toledo, and Youngstown, and provides local exchange services for nearly 3.5 million access lines through its 192 exchanges. This represents about sixty percent of all access lines in Ohio. Approximately eighty percent of Ameritech's revenues are derived from its provision of monopoly local exchange services. Ameritech's rates were last reviewed by the commission in 1985.

{¶ 3} On March 23, 1993, Ameritech docketed notice of its intent to file an application for an alternative form of regulation under R.C. 4927.04(A). On April 6, 1993, OCC filed a complaint against Ameritech pursuant to R.C. 4905.26, case No. 93-576-TP-CSS, alleging that Ameritech's rates were excessive under the R.C. 4909.15 ratemaking formula, and requesting that Ameritech's rates be reduced.

{¶ 4} On June 30, 1993, Ameritech filed its application for an alternative form of regulation. Attached to the application was a proposed plan for alternative regulation, which included a basic local exchange service and total jurisdictional revenue reduction of $14.3 million. On September 2, 1993, the commission accepted Ameritech's application for filing as of June 30. In this same entry, the commission found that OCC's complaint set forth reasonable grounds for a complaint under R.C. 4905.26; and consolidated OCC's complaint case and Ameritech's alternative regulation case for hearing purposes only.

{¶ 5} On March 25, 1994, the commission's staff issued its Report of Investigation of Ameritech's plan ("Staff Report"). The Staff Report recommended a reduction in Ameritech's total jurisdictional revenues of $125.88 million to

$144.667 million. That same date, the National Regulatory Research Institute ("NRRI") filed its analysis of several aspects of Ameritech's plan as an addendum to the Staff Report. Objections to the Staff Report were timely filed by numerous parties. OCC proposed Ameritech's total jurisdictional revenues be reduced by $197.386 million.

{¶ 6} Eighty-one witnesses testified over a period of forty-five days between June 22 and September 13, 1994. The consolidated hearings concluded on September 13, 1994.

{¶ 7} On September 20, 1994, a partial stipulation was filed by Ameritech, the commission staff, OCC, American Association of Retired Persons ("AARP"), Edgemont Neighborhood Coalition ("Edgemont"), city of Columbus, city of Cleveland, city of Toledo, Greater Cleveland Welfare Rights Organization ("GCWRO"), Consumers' League of Ohio, Western Reserve Alliance, Committee for Fair Utility Rates, Ohio Department of Administrative Services ("DAS"), Ohio Department of Education ("DOE"), Ohio Library Council ("OLC"), and Bell Communications Research, Inc.

{¶ 8} The stipulation resolved both cases and adopted the alternative regulation plan that phased in an $84.4 million reduction in Ameritech's basic local exchange service rates and total jurisdictional revenues (the actual reduction is $92.3 million, less an in-place toll service reduction of $7.9 million) over the term of the six-year plan. The reductions were phased in as follows: $37.8 million, year one; $11.9 million, year two; $11.2 million, year three; $8.6 million, year four; $7.5 million, year five; and, $7.4 million, year six. The phased-in revenue reduction is the same as a one-time reduction of $60.6 million. The revenue reductions are allocated among the residence (65.5 percent), nonresidence (25 percent), and carrier access (9.5 percent) customer classes. Thirteen local public hearings were held in various locations around the state between September 20 and October 12, 1994.

**{¶ 9}** The stipulation was opposed by AT&T Communications of Ohio, Inc. ("AT&T"), Sprint Communications Company, L.P. ("Sprint"), MCI Telecommunications Corporation ("MCI"), Litel Telecommunications Corporation and Mid-American Communications, d.b.a. LDDS Communications ("IXC Coalition"), Time Warner AxS ("Time Warner"), Ohio Cable Television Association ("OCTVA"), New Par Companies ("New Par"), Ohio Newspaper Association ("ONA"), U.S. Department of Defense and all other Executive Agencies ("Executive Agencies"), Ohio Public Communications Association ("OPCA"), Teleport Communications Group ("TCG"), Mid-East Telephone Answering Service Association-Ohio ("METAS-Ohio"), and Ohio Domestic Violence Network ("ODVN").

**{¶ 10}** Hearings reconvened on October 17, 1994, to consider the reasonableness of the stipulation. Ameritech witnesses Hollinger and McKenzie and OCC witness Rosselet supported the stipulation. AT&T witness Baumol, ONA witness Hatfield, Time Warner witness Selwyn, Sprint witness Sievers, and OPCA witness Meister opposed the stipulation, focusing upon the revenue reduction distribution and the plan's failure to address various competition issues.

**{¶ 11}** On November 23, 1994, the commission issued its opinion and order approving the stipulation. However, the commission reserved the right to revisit, during the term of the plan, several aspects of the plan and also changed or clarified other portions of the stipulation and plan. On rehearing, the commission found all of the allegations of error to be without merit.

**{¶ 12}** Timely appeals were then brought to the court by Time Warner, AT&T, and MCI.

———————————

*Emens, Kegler, Brown, Hill & Ritter, Samuel C. Randazzo, Richard P. Rosenberry* and *Denise C. Clayton*, for appellant Time Warner AxS.

4

*Bell, Royer & Sanders Co., L.P.A., Judith B. Sanders* and *Barth E. Royer,* for appellant MCI Telecommunications Corporation.

*Vorys, Sater, Seymour & Pease, Sandra J. Anderson* and *Benita Kahn;* and *Larry Salustro,* for appellant AT&T Communications of Ohio, Inc.

*Betty D. Montgomery*, Attorney General, *Duane W. Luckey, Ann E. Henkener, Thomas W. McNamee* and *Steven T. Nourse*, Assistant Attorneys General, for appellee, Public Utilities Commission of Ohio.

*Calfee, Halter & Griswold, Kevin M. Sullivan* and *Mark I. Wallach; Michael T. Mulcahy* and *Jon F. Kelly,* for intervening appellee Ameritech Ohio.

*Robert S. Tongren,* Consumers' Counsel*, Barry Cohen, David C. Bergmann, Andrea M. Kelsey* and *Richard W. Pace,* for intervening appellee Office of Consumers' Counsel.

*Bruce J. Weston*, for intervening appellee American Association of Retired Persons.

*William M. Ondrey Gruber*, Chief Assistant Director of Law, for intervening appellee city of Cleveland.

*Crabbe, Brown, Jones, Potts & Schmidt* and *Gregory J. Dunn*, for intervening appellee City of Columbus.

*Kerry Bruce*, for intervening appellee city of Toledo.

*Ellis Jacobs*, for intervening appellee Edgemont Neighborhood Coalition.

*Joseph P. Meissner*, for intervening appellees Greater Cleveland Welfare Rights Organization, Consumers' League of Ohio and Western Reserve Alliance.

_____

**MOYER, C.J.**

{¶ 13} Appellants propound a total of six propositions of law arguing that the commission abused its discretion when it adopted the partial stipulation and proposed alternative regulation plan. Each party also briefed the issue that we raised *sua sponte*: whether the commission exceeded its statutory authority

5

particularly when it used non-traditional rate-setting methods under R.C. 4927.04(A) to set Ameritech's rates. The commission contends that appellants waived this issue by not raising it below. We disagree. Subject matter jurisdiction cannot be waived. See, *e.g., Gates Mills Invest. Co. v. Parks* (1971), 25 Ohio St. 2d 16, 20, 54 O.O.2d 157, 159, 266 N.E.2d 552, 555. For the reasons that follow, we hold that the commission exceeded the scope of its statutory authority when it used alternative rate-setting methods to establish Ameritech's basic local exchange service rates below and reverse the order of the commission.[2]

**{¶ 14}** We will reverse an order of the Public Utilities Commission only if we find the order to be unlawful or unreasonable. R.C. 4903.13. We do not reweigh evidence or substitute our judgment for that of the commission on factual questions where there is sufficient probative evidence in the record to enable us to conclude that the decisions of the commission is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Canton Storage & Transfer Co. v. Pub. Util. Comm*. (1995), 72 Ohio St.3d. 1, 4, 647 N.E.2d 136, 140; *Indus.*

---

2. Given our finding that the commission lacked jurisdiction to use R.C. 4927.04(A) when setting Ameritech's rates below, we need not specifically address the remaining propositions of law raised by the appellants. However, in the interest of judicial economy and given the extensive briefing and arguments of the parties, we feel compelled to note our grave concern regarding the partial stipulation adopted in the case at bar. The partial stipulation arose from settlement talks from which an entire customer class was intentionally excluded. This was contrary to the commission's negotiations standard in *In re Application of Ohio Edison to Change Filed Schedules for Electric Service,* case No. 87-689-EL-AIR (Jan. 26, 1988) at 7, and the partial settlement standard endorsed in *Consumers' Counsel v. Pub. Util. Comm*. (1992), 68 Ohio St.3d 123, 125-126, 592 N.E.2d 1370, 1373. The benefits of alternative rate treatment and deregulation for the local exchange company under R.C. 4927.03 and 4927.04 are to be balanced by an equal offset of increased competition, infrastructure commitments, and other benefits to the ratepayers. R.C. 4927.02. This balancing did not occur. Ameritech managed to either settle its competitive issues or defer them until a later date, all without having its competitors at the settlement table. Under these circumstances, we question whether the stipulation, even assuming the commission's authority to approve it, promotes competition in the telephone industry as intended by the General Assembly. We would not create a requirement that all parties participate in all settlement meetings. However, given the facts in this case, we have grave concerns regarding the commission's adoption of a partial stipulation which arose from the exclusionary settlement meetings.

*Energy Consumers of Ohio Power Co. v. Pub. Util. Comm.* (1994), 68 Ohio St.3d 547, 554, 629 N.E.2d 414, 420; *MCI Telecommunications Corp. v. Pub. Util. Comm.* (1988), 38 Ohio St.3d 266, 268, 527 N.E.2d 777, 780.

{¶ 15} The jurisdictional issue presented by this appeal invokes our authority to review questions of law. *MCI Telecommunications Corp*. at 268, 527 N.E.2d at 780; *Indus. Energy Consumers of Ohio Power Co. v. Pub. Util. Comm.* (1994), 68 Ohio St.3d 559, 563, 629 N.E.2d 423, 426. The determination of whether the commission deviated from the proper standard when applying R.C. 4927.04(A) is a question of law.

{¶ 16} The commission, as a creature of statute, may exercise only that jurisdiction conferred upon it by statute. *Canton Storage & Transfer Co.,* 72 Ohio St.3d. at 5, 647 N.E.2d at 141; *Columbus S. Power Co. v. Pub. Util. Comm.* (1993), 67 Ohio St.3d 535, 537, 620 N.E.2d 835, 838. The commission's authority to use non-traditional rate-setting methods is set forth in R.C. Chapter 4927. In reaching our decision, we first examine the history underlying the General Assembly's adoption of R.C. Chapter 4927.

{¶ 17} Prior to 1989, the commission set all telephone utility rates pursuant to the statutory criteria in R.C. 4909.15, 4909.17, 4909.18, and 4909.19. See *Gen. Tel. Co. v. Pub. Util. Comm.* (1962), 173 Ohio St. 280, 19 O.O.2d 153 181 N.E.2d 698; *Cleveland v. Pub. Util. Comm.* (1956), 164 Ohio St. 442, 58 O.O. 289,132 N.E.2d 216. Pursuant to R.C. 4909.17, a utility cannot increase, decrease, or change its tariff rates without commission approval. A utility may seek commission approval to change its rates by filing an application under R.C. 4909.18. If the application seeks a rate decrease, the commission may, if it finds the decrease reasonable, institute the decrease without a hearing. Cf. *Pub. Util. Serv., Inc. v. Pub. Util. Comm.* (1980), 62 Ohio St.2d 421, 406 N.E.2d 522. This allows ratepayers to benefit from a rate reduction immediately. However, if the application seeks a rate increase or if the commission finds the proposed decrease

unreasonable, then the commission must hold a hearing and the investigation and notice provisions of R.C. 4909.19 apply. R.C. 4909.18; 4909.19.

{¶ 18} During the late 1970s and early 1980s, increasing competitive pressures and technological advances dramatically changed the telephone industry. We recognized these changes as early as 1982:

"What is clear is that the radical transformation of the formerly monopolistic, regulated telecommunications market is proceeding apace and that this transformation is of such magnitude as to require a thorough reexamination of these regulatory practices and procedures which have become inapplicable or obsolescent in the face of non-monopolistic market conditions." *Armco, Inc. v. Pub. Util. Comm.* (1982), 69 Ohio St.2d 401, 411, 23 O.O.3d 361, 368, 433 N.E.2d 923, 929.

{¶ 19} On June 23, 1987, H.B. No. 563 was introduced to accommodate the technological evolution in the industry. H.B. No. 563 (as introduced); Accord Darr, Deregulation of Telephone Services in Ohio, 24 Akron. U. Law Rev. (1990) 294-295. H. B. No. 563 sought to deregulate the telephone industry, including removal of limitations on market entry and commission control and regulation of rates. Legislative Services Analysis of H.B. No. 563 (as introduced) at 3-4, 6. However, after the initial hearings, H.B. No. 563 stalled for approximately a year. Deregulation of Telephone Services in Ohio, *supra*, at 296.

{¶ 20} Then, in late 1988, the commission's chairman provided a substitute bill to the House Public Utilities Committee. Sub. H.B. No. 563, 117th General Assembly, 2d Session (1988). This version of the bill was much less expansive than its predecessor. Although Sub. H.B. No. 563 permitted deregulation for competitive services, it retained the existing monopoly franchises and drastically limited the deregulation of rates in the local monopoly markets to rate increases

cases only.[3] Legislative Services Analysis of Am. Sub. H.B. No. 563 (as passed by the Senate and reported by S. Ways and Means) at 1, 4. By retaining the existing procedural filing requirements, the commission could then compare the proposed alternative rate method with the information filed under the traditional rate formula to ensure that the alternative method was in the public interest. Sub. H.B. No. 563 became effective on March 17, 1989, as R.C. Chapter 4927.

{¶ 21} Under R.C. 4927.03(A)(1), the commission may deregulate and exempt "* * * any public telecommunications service *except basic local exchange service, from any provision of [R.C.] Chapter 4905. or 4909.*[,]* * *" if that service is subject to competition or there are reasonably available alternatives to the service and the service is in the public interest. (Emphasis added.) The General Assembly defined "basic local exchange service" very broadly in R.C. Chapter 4927. This service includes access to the network by both end users, for example residential and business consumers, and also by competing long distance carriers for the purpose of sending or receiving voice grade, data, or image communications. R.C. 4927.01(A). These access services were part of the traditional monopoly services. Thus, the General Assembly prohibited the commission from deregulating the traditional monopoly services in R.C. 4927.03. However, the commission was given limited authority to use non-traditional rate-setting methods for these monopoly services under R.C. 4927.04(A). This section provides:

---

3. "The bill authorizes the Public Utilities Commission (PUCO), upon its own initiative or the application of a telephone company, to *partially or wholly deregulate any telecommunications service except basic local exchange service*, or to prescribe new regulations for any service which are different from those already in law. *** *With respect local exchange service* *** the bill permits the PUCO to use methods for setting rates that are different from the method prescribed in existing law ***. Under the bill such *alternative methods may be used in a rate case for which a rate increase has been requested and applied for under the procedural requirements of existing law. The PUCO must find that the alternative ratemaking method is in the public interest ***."* (Emphasis added.) Legislative Services Analysis of Am.Sub.H.B. No. 563 (as passed by the Senate and reported by S. Ways and Means) at 1, 4.

"*In considering an application pursuant to sections 4909.18 and 4909.19 of the Revised Code for an increase in rates and charges for basic local exchange service * * *, the commission*, upon its own initiative or the request of the applicant, *may establish rates and charges for the service by a method other than that specified in section 4909.15 of the Revised Code, provided the commission finds the use of the alternative method of establishing rates and charges to be in the public interest* and provided, in instances where the alternative method is proposed by the commission, the applicant consents. * * *" (Emphasis added.)

{¶ 22} Thus, the commission may use alternative rate-setting methods to set rates for basic local exchange services when the commission is reviewing an application that (1) is filed pursuant to R.C. 4909.18 and 4909.19, (2) seeks a rate increase for basic local exchange service, and (3) is in the public interest. Accordingly, the threshold questions for determining whether the commission properly set Ameritech's rates under R.C. 4927.04(A) are whether Ameritech's application was filed pursuant to R.C. 4909.18 and 4909.19, and, if so, whether the application sought to increase basic local exchange service rates. In the case at bar, neither question is answered affirmatively.

{¶ 23} Ameritech argues that it filed its application pursuant to R.C. 4909.18 and 4909.19. The record does not support that assertion. Ameritech's application states that it is filed pursuant to R.C. 4927.03 and 4927.04. Further, before filing its application, Ameritech sought a commission waiver of most of the standard rate-increase filing requirements (SFRs). In that motion, Ameritech stated "Ohio Bell's application will supply all data required by §4909.18(A) through (E). Thus, Ohio Bell is seeking no waiver as to information which is statutorily specified. [fn.]" "[fn.] It should be noted, however, the statute expressly grants the Commission authority to waive any or all of the requirements of exhibits (A) through (D). Ohio Rev. Code §4909.18. By using this organizational format, Ohio Bell does not concede the applicability or relevancy of the requirements of

§4909.18 to its plan." Ameritech could not argue that these sections were inapplicable and irrelevant to its plan if it had filed its application pursuant to R.C. 4909.18 and 4909.19, as R.C. 4927.04(A) requires.

{¶ 24} The commission asserts that Ameritech's application was filed pursuant to R.C. 4909.18, because Ameritech provided informational schedules consistent with an application under that section. However, the commission never found or held that Ameritech's application was filed pursuant to R.C. 4909.18 and 4909.19. Further, although the commission required Ameritech to file certain informational schedules, the commission did so because the commission's staff needed the information to adequately review the proposed plan. Had the commission denied the waiver requests because the exhibits were required under R.C. 4909.18, the commission would have said so. It did not. Thus, we find that Ameritech's application was not filed pursuant to R.C. 4909.18 and 4909.19, as required by R.C. 4927.04(A).

{¶ 25} We next consider the question of whether Ameritech's application sought to increase Ameritech's basic local exchange rates. Ameritech and the intervening consumer appellees initially argue that R.C. 4927.04(A) is not limited solely to rate increase applications, contending that such an interpretation unnecessarily restricts the use of alternative rate regulation and contravenes the intent of the General Assembly. This argument is without merit.

{¶ 26} "'Where the language [of a statute] * * * clearly expresses the legislative intent, the court need look no further[,]'" because "at that point the interpretive effort is at an end, and the statute must be applied accordingly." *Provident Bank v. Wood* (1973), 36 Ohio St.2d 101, 105-106, 65 O.O.2d 296, 298, 304 N.E.2d 378, 381. Accord *Wachendorf v. Shaver* (1948), 149 Ohio St. 231, 36 O.O. 554, 78 N.E.2d 370, paragraph five of the syllabus. The commission was permitted to use alternative rate-making methods to set rates for basic local exchange services only when considering an application "for an increase in the

rates and charges for basic local exchange service * * *." R.C. 4927.04(A). Thus, the commission's use of non-traditional rate-setting methods for basic local exchange service is limited solely to applications seeking to increase rates for that service. Any other interpretation defies the express language and clear intent of the General Assembly.

{¶ 27} Appellees also assert that Ameritech's application sought to increase basic local exchange service rates because it includes one basic local exchange service tariff that immediately increases (Centrex installation costs for some new customers) and a few other tariffs (residential flat rate service and residential network access service after a three year freeze) that may increase sometime in the future.

{¶ 28} Ameritech contends that there is a conceptual distinction between increasing rates and increasing revenues. Ameritech argues that an application including a single tariff increase constitutes an application for a rate increase, even though the company's revenues for basis local exchange service go down. We disagree. We understand the relationship and correlation between rates and revenues, and find that in the context of R.C. 4927.04(A), an application seeking to increase basic local exchange service rates will also result in an increase in basic local exchange service revenue.

{¶ 29} Centrex installation rates for new customers could increase under the new rate structure, depending upon how many station lines were installed at one time.[4] However, the remaining basic local exchange tariffs were frozen or decreased by $14.3 million. Thus, the question becomes whether a nominal increase in one basic local exchange tariff, alone, can trigger application of R.C.

---

4. This potential increase does not affect existing customers. New customers rates will depend upon the number of lines installed at one time by the subscriber. Thus, it is difficult to determine, on a per customer basis, the amount of the increase or decrease each new individual customer may have. However, the application reflects that Centrex revenues were proposed to increase by only about $84,000 per year.

4927.04(A) when the net change from the remaining tariffs to the basic local exchange service rates as a whole results in a revenue decrease. For the reasons that follow, we hold that increasing a single tariff does not trigger application of R.C. 4927.04(A), when the net tariff changes for the basic local exchange service as a whole results in a revenue decrease.

{¶ 30} Under R.C. 4909.18, a utility may file an application to increase or decrease a single tariff rate. This section allows applications "* * * to modify, amend, change, increase, or reduce *any existing rate*, * * * *toll, classification, [or] charge*." (Emphasis added.) No similar language appears in R.C. 4927.04(A). Instead, R.C. 4927.04(A) requires the rates and charges for the entire basic local exchange service to increase before the commission may use alternative rate-setting methods. The term "basic local exchange service" includes numerous tariffs, including all of the monopoly services and access to the interexchange or other networks, and does not speak in terms of a single tariff change. R.C. 4927.01(A). Consistent with this interpretation, R.C. 4927.04(A) describes the commission's rate-setting authority as "establish[ing] rates and charges for *the service*" that is being increased, not for a single tariff. (Emphasis added.)

{¶ 31} Under this analysis, increasing a single basic local exchange tariff may not constitute an overall increase in the rates and charges for the basic local exchange service. Had the General Assembly intended the commission's authority under this section to be triggered by a single tariff rate increase, irrespective of its effect on the service as a whole, the General Assembly would have used similar language to that found in R.C. 4909.18. It did not. Thus, increasing a single basic local exchange service tariff may not trigger the use of R.C. 4927.04(A) if that tariff increase does not also result in an overall basic local exchange service revenue increase.

{¶ 32} Were we to conclude that R.C. 4927.04(A) permits a single tariff increase to trigger application of alternative regulation, we would likewise then be

required to conclude that this section limits the commission's use of the alternative methods to only "the service" that is increasing. In other words, if the phrase is singular, like appellees contend, then the commission exceeded the scope of its authority when it applied alternative rate-setting methods to the entire case, rather than just the service that was increasing.

{¶ 33} Although one basic local exchange service tariff increased immediately in this case, the rates and charges for the basic local exchange service as a whole decreased by approximately $14 million. Under these facts, we find that Ameritech's application did not constitute an application for an increase in basic local exchange service rates as required by R.C. 4927.04(A). Accepting appellees' interpretation of R.C. 4927.04 would permit a utility to circumvent the "rate increase" language simply by manipulating a single tariff. That was not the intent of the General Assembly.

{¶ 34} Ameritech argues that it could have reduced rates without a hearing under R. C. 4909.18 if it had so desired. Thus, Ameritech contends that since it sought a hearing on its proposed plan, the plan must have sought to increase basic local exchange service rates. We disagree.

{¶ 35} True, Ameritech could, with commission approval, reduce its rates without a hearing under R.C. 4909.18. However, this procedure would not have produced the results that Ameritech sought. One of Ameritech's primary goals for filing its plan was to eliminate the commission's continued rate-of-return earnings regulation and earnings review. If Ameritech reduced its rates under R.C. 4909.18, then it would have lower rates, but would also continue to be regulated under the traditional rate-of-return, rate base, form of regulation. This was not acceptable to Ameritech. Ameritech could not eliminate commission oversight of its rates and earnings with a rate reduction under R.C. 4909.18. The only way for Ameritech to throw off the yoke of traditional rate-base, rate-of-return regulation was through the use of alternative regulation under R.C. Chapter 4927. Thus, reducing rates

under R.C. 4909.18 was never a viable option for Ameritech, and this argument is irrelevant to whether Ameritech's application sought to increase basic local exchange service rates.

**{¶ 36}** The commission argues that the proposed price cap mechanism is analogous to a flexible rate tariff under R.C. 4905.31 and should therefore be considered valid. See *Armco, supra,* 69 Ohio St.2d at 407, 433 N.E.2d at 927. *Armco* does not support the commission's position.

**{¶ 37}** In *Armco*, Ohio Bell Telephone Company sought commission approval of a flexible pricing tariff for its non-monopoly equipment tariff, so that the tariff prices could rapidly change to accommodate competitive pricing pressures. *Id*. at 401-404, 433 N.E.2d at 924-925. The commission approved the request and established a flexible rate tariff, with both a minimum and a maximum rate, under R.C. 4905.31(E). The commission established the minimum rate for the range using traditional R.C. 4909.15 methods. *Id*. at 403, 433 N.E.2d at 925. The maximum rate was set at two times the minimum rate. *Id*.

**{¶ 38}** We found that "R.C. 4905.31(E) constitute[d] an exception to the general ratemaking formula contained in R.C. 4909.15." 69 Ohio St.2d at 408, 433 N.E.2d at 928. We also specifically noted the competitive nature of the rates involved, before ultimately approving the commission's use of a flexible pricing schedule under R.C. 4905.31(E). *Id*. at 408-409, 433 N.E.2d at 928. The relevant factors in *Armco* are not present in this case.

**{¶ 39}** Here, the plan proposed no maximum rate for the price cap formula. The price cap automatically moves with the various indexed factors that comprised its formula. Thus, rates under the proposed price cap could increase every year the plan was in effect if the formula so permitted. Moreover, the equipment tariff rates in *Armco* were competitive in nature. 69 Ohio St.2d at 408-409, 433 N.E.2d at 928. Here, the price cap purports to apply to basic local exchange services, which are decidedly not competitive. Further, under R.C. 4905.31, the commission retains

control and authority over the flexible pricing mechanism. 69 Ohio St.2d at 408, 433 N.E. 2d at 927-928. Here, the intent was to totally eliminate the commission's control over rates once the price cap formula was approved. Given these differences, our approval of flexible pricing under R.C. 4905.31 in *Armco* does not independently support the validity of the price cap formula or its use as a trigger to applying alternative regulation methods to basic local exchange service rates in this case. Further, Ameritech acknowledged to the commission that its plan did not seek a threshold rate increase. Finally, the commission never stated that Ameritech's application sought to increase basic local exchange service rates.

{¶ 40} The commission's failure to make this essential finding is understandable in light of its apparent misinterpretation of R.C. 4927.04(A) in *In re Commission Alternative Regulation Rules for Large Local Exchange Companies*, case No. 92-1149-TP-COI. In that docket, the United Telephone Company of Ohio specifically asked the commission "whether a plan which does not include a provision for a rate increase can be filed under Section 4927.04(A), Revised Code." *In re Commission Alternative Regulation Rules for Large Local Exchange Companies*, Case No. 92-1149-TP-COI (Mar. 10, 1993), Entry on Rehearing at 4. The commission responded that "[a]n alternative regulation plan, *which may or may not include an increase in rates*, should be filed pursuant to Section 4927.04(A), Revised Code." (Emphasis added.) *Id*. Thus, the commission declared that under its rules all applications, whether or not seeking a rate increase, should be filed under R.C. 4927.04(A). This statement contradicts the "rate increase" requirement in R.C. 4927.04(A), and expands the commission's authority under that section. The commission cannot *sua sponte* enlarge its statutory authority by rule. See *Sterling Drug, Inc. v. Wickham* (1980), 63 Ohio St.2d 16, 19, 17 O.O.3d 10,12, 406 N.E.2d 1363, 1366. Accord *Burger Brewing Co. v. Thomas* (1975), 42 Ohio St.2d 377, 383, 71 O.O.2d 366, 329 N.E.2d 693, 697. Thus, it would appear that Ameritech was merely following the commission's rules

when it requested alternative rate treatment under R.C. 4927.04(A) in its rate decrease case below. This does not validate Ameritech's request for alternative ratemaking treatment under R.C. 4927.04(A) in this case, but certainly makes that request understandable.

{¶ 41} It follows that, Ameritech's application did not trigger the commission's use of alternative rate treatment under R.C. 4927.04(A), and the commission exceeded the scope of its statutory authority when it used non-traditional rate-setting methods to set Ameritech's rates. Accordingly, the commission's exercise of authority under R.C. 4927.04(A) was unlawful and its opinion and order should be reversed.

{¶ 42} Although the commission's order may be grounded in sound public policy and furthers the commission's recent attempts to foster free and open competition in Ohio, it is beyond the scope of the commission's statutory authority. The General Assembly, not the commission, must make changes in the regulatory scheme to permit the use of alternative rate setting methods for basic local exchange service in cases not involving a rate increase. Thus, only the General Assembly makes policy decisions based upon the concept of free competition. See, *e.g.*, *Canton Storage & Transfer Co., supra*, 72 Ohio St.3d at 5, 647 N.E.2d at 141. If basic local exchange service in Ohio is to become freely competitive, the General Assembly must effect that change. Absent that change in the statutory framework, the commission is constrained, as we are, to apply the existing statutory framework to all applications for an alternative form of regulation. Accordingly, the commission erred when it attempted to bypass the General Assembly and use alternative regulation in setting basic local exchange service rates for Ameritech in a case not requesting an increase in basic local exchange service rates.

{¶ 43} For the reasons set forth above, we find that the commission exceeded the scope of its statutory authority when it adopted the partial stipulation and set Ameritech's basic local exchange service rates using alternative methods

under R.C. 4927.04(A).  Accordingly, the commission's order is reversed and the cause is remanded.

*Order reversed*

*and cause remanded.*

DOUGLAS, WRIGHT, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

_____